IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KENNETH E. SWEET, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 16 C 8151 |
| INTERNATIONAL SERVICES, INC., | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Kenneth Sweet has sued his former employer, International Services, Inc. (ISI), for age discrimination and retaliation in violation of the Age Discrimination in Employment Act (ADEA). Sweet worked as ISI's Executive Director of Consulting Services and alleges that he was, at sixty-three years old, terminated and replaced by a younger employee because of his age. He further alleges that ISI unlawfully discontinued a referral relationship established after his firing between ISI and Sweet's separate company in retaliation for his filing of an EEOC complaint and this lawsuit. Sweet filed a motion for summary judgment on the issue of liability and ISI filed a cross-motion for summary judgment on all of Sweet's claims. For the reasons stated below, the Court denies Sweet's motion in full, denies ISI's cross-motion regarding claim 1, and grants ISI's cross-motion regarding claim 2.

### Background

The following facts are undisputed except where otherwise indicated. Kenneth

Sweet was hired by International Services, Inc. (ISI)—then doing business under the name International Profit Associates—in 1991. Initially, he served as a Senior Business Consultant. He was promoted twice and became ISI's Executive Director of Consulting Services in April 1992. In this role, Sweet oversaw the company's consulting services division, one of the company's four segments. Relevant later, the consulting division operates alongside the business coordination, sales, and survey divisions.

ISI thrived in the early 2000s. Its annual revenues peaked at over $200,000,000. But the 2008 financial crisis hit the company hard. Its revenues fell by almost half, and its workforce drastically contracted. Unsurprisingly, the annual consulting hours sold by ISI also fell drastically. The parties appear to disagree about the primary cause, but economic conditions seem to be an uncontested factor in the company's decline. To address its shortfall, the company instituted across-the-board pay cuts and reduced personnel.

In the years following the financial crisis, ISI did not fully regain its former glory. The parties dispute the reasons behind this continued malaise, but they appear to agree about the bottom line assessment: the company was in trouble. In 2015, ISI's owner, John Burgess, decided to terminate Sweet from his leadership position. ISI alleges that this decision was based principally on finances—the company was in dire straits and needed to eliminate costs by cutting payroll. It further alleges that morale was low in the consulting division, that Sweet had failed to competently lead the division, and that the company's annual consulting hours fell precipitously in the time before Sweet's termination. On this latter contention, ISI alleges that Sweet was primarily responsible for the decline in billed hours. *See* Def.'s Br. in Supp. of Cross-Mot. for Summ. J., dkt.

no. 77, at 3 ("The Executive Director of Consulting is more responsible than anyone else for generating quality consulting services for a reasonable fee.")

Sweet contests ISI's characterization of its motives.  First, he alleges that several contemporaneous statements made by Burgess suggest that was terminated because of his age.  For instance, ISI admits that, when Sweet asked why he was being fired, Burgess told him:  "It's time. You had a good run, but it's time."  Def.'s Resp. to Pl.'s LR 56.1 Stat., dkt. no. 80, ¶ 45.  Sweet also points to Burgess' statements that ISI needed "new blood" in management and that "the smart thing for [Sweet] to do is retire."  Pl.'s Br. in Supp. of Mot. for Summ. J., dkt. no. 69, at 8.

Next, Sweet asserts that ISI's financial fortunes several years after the financial crisis were more complicated than it suggests in this litigation.  He alleges that, in any case, those financial problems stemmed primarily from Burgess' own mismanagement, not Sweet's, and did not support Burgess' decision to terminate Sweet.  *See, e.g.*, Pl.'s Resp. to Def.'s LR 56.1 Stat., dkt. no. 88, at ¶¶ 5-6.  Sweet also points to performance awards he won in the years before his firing and to Burgess' public acknowledgement of his contributions in his announcement of the termination as evidence that he was a competent, successful leader.  *Id.* ¶ 37.  And Sweet cites deposition testimony that he contends rebuts ISI's assertions about low morale in the consulting division.  *Id.*

Finally, Sweet contends that declining consulting hours were outside of his control and were instead caused by ISI's other divisions.  *See* Pl.'s Resp. to Def.'s LR 56.1 Stat., dkt. no. 88, ¶ 5.  Specifically, he asserts that "the primary reason ISI revenues declined was the number of annual consulting jobs sold by the ISI sales and survey department dropping."  *Id.*  Sweet alleges that "the average consulting hours

billed per job"—a metric for which Sweet says he was primarily responsible—actually "increased from 105.6 in 2009 to 128.5 hours for 2014 and was 124.5 hours at the time of [his] wrongful termination." *Id.* And he notes that the parties agree that overall consulting hours had rebounded somewhat immediately before he was fired, increasing by nearly thirty percent in the two preceding weeks. *See* Def.'s Resp. to Pl.'s LR 56.1 Stat, dkt. no. 80, ¶ 46.

In sum, Sweet alleges that the reasons ISI has offered for his firing are inconsistent and that none is supported by undisputed record evidence.

Sweet was terminated on July 23, 2015. He was sixty-three years old. In connection with his departure, Sweet negotiated a Settlement and Referral Agreement with ISI whereby (1) Sweet would be paid $600,000 in monthly increments and (2) a separate company owned by Sweet, RWI Wealth Management, would have the option to receive business referrals from ISI for a set fee. Notably, the parties agree that the agreement did not create an obligation for either RWI or ISI to refer business to the other but rather simply designated a standard fee to be paid when a referral was made. *See* Pl.'s Resp. to Def.'s LR 56.1 Stat, dkt. no. 88, ¶ 14. The agreement had potential to benefit both companies because ISI was discontinuing certain services that RWI planned to offer. And, in fact, during the following months two of ISI's employees who had been part of the discontinued group, Dale Johnston and Roger Ferrante, left ISI and joined RWI. ISI immediately began referring business to RWI.

Sweet was replaced as Executive Director of Consulting Services at ISI by Brent Parsigian, a longtime ISI employee. Parsigian is fourteen years younger than Sweet and does not have a college degree, which Sweet alleges rendered him unqualified for

4

the position.  Pl.'s LR 56.1 Stat., dkt. no. 68, ¶¶ 26, 49.  *But see* Def.'s Resp. to Pl.'s LR

56.1 Stat., dkt. no. 80, ¶¶ 26, 49 (disputing Sweet's allegation that there were set job

requirements for the Executive Director of Consulting Services position that included a

college degree).

Sweet filed an age-discrimination complaint against ISI with the EEOC in April

2016.  The companies' referral relationship continued despite the EEOC complaint—but

not for long.  Johnston and Ferrante testified that by May or June 2016, they were

aware that Sweet intended to escalate the dispute with ISI into litigation.  Def.'s LR 56.1

Stat., Ex. G, dkt. no. 111, at 64:9-67:2; *id.*, Ex. H, dkt. no. 76-7, ¶¶ 7-9.  They met with

Brent Parsigian to discuss how their referral relationship with ISI could continue in light

of the impending litigation.  Johnston and Ferrante further testify that in June, with

Sweet's blessing, they formed an independent company separate from RWI called

Ascend Business Services in order to continue the referral relationship with ISI.

Sweet filed this action on August 16, 2016.  Although the parties dispute

precisely when ISI's referrals to RWI ceased, referrals to Ascend began in September

2016.

## Discussion

Sweet and ISI have filed cross-motions for summary judgment.  Sweet's motion

can be disposed of quickly.  When a plaintiff who bears the burden of proof on his claim

moves for summary judgment, he may prevail *only* if he can "lay out the elements of the

claim, cite the facts which [he] believes satisfies these elements, and demonstrate why

the record is so one-sided as to rule out the prospect of a finding in favor of the non-

movant on the claim."  *Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d

5

593, 601 (7th Cir. 2015). Here, Sweet inverts the burden of proof by suggesting that *the defendant* must produce affirmative evidence that it did not act with discriminatory animus to survive summary judgment. Not so. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (collecting cases and reaffirming that, even under an employment-discrimination burden-shifting framework, the "plaintiff at all times bears the ultimate burden of persuasion" (internal quotation marks omitted)). Because Sweet bears the burden of proving liability under the ADEA and cannot demonstrate that the record is sufficiently one-sided to support summary judgment in his favor, the Court denies his motion for summary judgment on the issue of liability.

In support of its cross-motion, ISI contends that Sweet was terminated for several legitimate, non-discriminatory reasons and that he has failed to produce evidence from which a factfinder could reasonably infer age discrimination under either the "direct" method of proof or the burden-shifting framework adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), sometimes referred to as the "indirect" method of proof. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016).

Summary judgment is proper where there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Nicholson v. City of Peoria*, 860 F.3d 520, 522 (7th Cir. 2017). In assessing a motion for summary judgment, a court views all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Carson v. Lake County*, 865 F.3d 526, 532 (7th Cir. 2017). Courts must be especially cautious in applying the summary judgment standard to employment discrimination cases because such cases often turn on intent and credibility issues.

*See Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Nevertheless, "reasonable inferences" must be supported by more than "speculation and conjecture." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012) (citation omitted). "[A] genuine issue of material fact exists only if there is enough evidence that a reasonable jury could return a verdict in favor of the nonmoving party." *Id.*

### A. ADEA discrimination claim

The ADEA prohibits employers from discriminating against employees who are forty years of age or older because of their age. 29 U.S.C. §§ 623(a)(1), 631(a); *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452 (7th Cir. 2009). To prove discrimination, the plaintiff must demonstrate "but-for" causation—i.e., "that the employer would not have made the adverse employment decision in question but for [the employee's] membership in a protected class." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003), *overruled on other grounds by Ortiz*, 834 F.3d at 765.

In *Ortiz*, the Seventh Circuit clarified that the proper way for a court to assess an employment discrimination claim on summary judgment is to ask whether the evidence, considered as a whole "would permit a reasonable factfinder to conclude that the plaintiff's [protected characteristic] caused the discharge or adverse employment action." *Ortiz*, 834 F.3d at 765. The Seventh Circuit was careful, however, to note that courts may still apply the *McDonnell Douglas* burden-shifting framework to evaluate evidence of but-for causation in employment discrimination cases. Considering how the parties arranged their arguments, the Court will structure its analysis according to the *McDonnell Douglas* framework.

To survive summary judgment under *McDonnell Douglas*, "the plaintiff must first establish a prima facie case by meeting the following elements: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of his protected class were treated more favorably." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004). Once the employee has established a prima facie case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the termination. *Carson*, 865 F.3d at 533. The burden then shifts back to the plaintiff to point to evidence showing that the employer's proffered explanations are pretextual. *Id.* Showing pretext requires evidence that the proffered reasons are phony, not merely mistaken. *Owens v. Chi. Bd. of Educ.*, 867 F.3d 814, 815 (7th Cir. 2017). Notably, "the existence of a genuine issue of triable fact with respect to some of the reasons for discharge proffered by the employer is of no consequence as long as at least one reason is uncontested." *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 399 (7th Cir. 1998).

Here, by presenting no argument on the question, ISI apparently concedes that Sweet can make out a prima facie case. *See* Def.'s Br. in Supp. of Cross-Mot. for Summ. J., dkt. no. 77, at 10 (assuming "that Plaintiff can make out a prima facie case of discrimination" and arguing that "he cannot point to evidence from which a reasonable factfinder could find that ISI's proffered reason for terminating him was pretextual"). ISI instead focuses its analysis on the issue of pretext. Although numbered differently throughout ISI's papers, the proffered reasons for Sweet's termination boil down to: (1) declining consulting hours purportedly attributable to poor performance by the

8

consulting division; (2) issues of Sweet's competence and allegedly resulting morale problems in the group he led; and (3) economic and financial issues facing the company as a whole. On declining consulting hours, ISI points to uncontested evidence that the company's total billed consulting hours had been in decline at the time of Sweet's termination. On Sweet's competence and low morale, it highlights deposition testimony from Burgess, ISI's owner, and some of Sweet's colleagues that it asserts support its contentions. On the company's financial issues, ISI points to evidence indicating that the company had to restructure, reduce payroll drastically, and terminate several employees in response to its lender demanding major changes, among other pressures.

Sweet has successfully identified genuine factual disputes on both of ISI's first two justifications. First, he argues that declining consulting hours were outside of his control. Pointing to admissible evidence in the record, he contends that it was the survey division, not the consulting division, that controlled inflows of business, and that the consulting division actually increased the number of hours billed per job in the years preceding his termination. *See* Pl.'s Resp. to Def.'s LR 56.1 Stat., dkt. no. 88., ¶ 5. In other words, there was a ceiling on how many hours the consulting division could bill, which was a function of the performance of the company's other divisions. Second, Sweet disputes ISI's characterizations of his competence and the division's morale. He points to awards the company gave him for his performance in the years leading up to his firing—and to Burgess' own public statements about his performance—to argue that the company itself believed him to be competent. He also notes that the record includes contradictory testimony relating to morale in the division. *See, e.g.*, *id.* ¶¶ 37, 65 (highlighting testimony by two of Sweet's colleagues that support inferences that (1)

9

payroll delays may have been the primary cause of low morale and (2) Sweet was not widely seen as responsible for low morale within the division).

This review of the parties' contentions reveals record evidence beyond mere "speculation and conjecture" supporting Sweet's allegation that each of the first two reasons offered for his firing is pretextual. *Advocate S. Suburban Hosp.*, 700 F.3d at 1104. In view of this evidence, the Court concludes that Sweet has raised genuine issues of material fact on each of the first two proffered reasons.

But only a single explanation need survive to permit summary judgment, *see Adreani*, 154 F.3d at 399, and ISI's third proffered reason for the firing—that Sweet was terminated as part of cutbacks precipitated by financial catastrophe—presents a closer question. The parties focus their arguments on three relevant ways a plaintiff can show pretext. First, where a defendant points to economic or financial motives for a termination, the plaintiff can show pretext by offering evidence that "the company lied about its financial concerns." *Brown v. Bd. of Trs. of Univ. of Ill.*, 673 F. App'x 550, 553 (7th Cir. 2016); *see also Davis*, 368 F.3d at 785. Second, pretext may be shown by evidence of remarks by decisionmakers that suggest unlawful motives. *See, e.g., Henderson v. Shulkin*, 720 F. App'x 776, 764 (7th Cir. 2017); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000); *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 428 (7th Cir. 2000) (describing *Reeves* as "a cautionary note not to grant summary judgment too readily when facts are susceptible to two interpretations, and not to dismiss as irrelevant damaging remarks" that suggest age-related animus). Third, a jury may reasonably infer pretext from evidence of a defendant's shifting and inconsistent justifications for a termination. *See Zaccagnini v.*

*Chas. Levy Circulating Co.*, 338 F.3d 672, 678 (7th Cir. 2003); *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003); *Statler v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 291 (7th Cir. 1999). "But the explanations must actually be shifting and inconsistent to permit an inference of mendacity." *Schuster*, 327 F.3d at 577. If Sweet can, using any of these three mechanisms, raise a genuine issue of material fact regarding whether ISI's third proffered reason—its financial hardship—is a pretextual attempt to hide age-related animus, the motion for summary judgment must fail.

Sweet first attempts to raise a genuine issue of material fact by disputing the company's description of the financial hardship it faced at the time of his firing. In response, ISI argues that "[i]n order to accept Plaintiff's claim of pretext, this Court must believe that Defendant intentionally reduced its revenue to the point of near catastrophic levels, lowered employee morale, delayed payroll twice, paid penalties and interest to the IRS for unpaid payroll taxes, risked losing its bank accounts, paid high interest on commercial loans, terminated the president and numerous other employees, and cut over six million dollars from its payroll on the pretense of economic hardship—just so it could cover its tracks as part of an elaborate scheme to terminate Ken Sweet." Def.'s Reply Br., dkt. no. 106, at 5-6. But ISI's argument is a red herring entirely unsupported by its citation to *Davis*. In that case, the Seventh Circuit indeed rejected a plaintiff's argument that "all the bluster about an economic downturn was a ruse." *Davis*, 368 at 785. But, unlike ISI apparently suggests, it reached that conclusion *not* because the plaintiff failed to demonstrate that the defendant had *intentionally* sabotaged its business to rationalize the disputed firing, but rather because "all of the evidence point[ed] to a sincere belief that the economy was trending negatively and that

11

economic terminations were an appropriate business response." *Id.* In other words, *Davis* did not hold—or even hint—that a plaintiff must demonstrate intentional self-sabotage on behalf of his employer to raise a genuine issue of material fact regarding whether a financial explanation was pretextual.

But even applying the rule actually articulated in *Davis*, Sweet has failed to demonstrate pretext on this theory. Although he cannot point to evidence undermining the company's assertion that its bank demanded it make speedy, sweeping changes, Sweet quibbles about *how much* the company reduced its payroll and total personnel during 2015. While the exact amount of the payroll reduction is unclear, ISI's tax information and supporting testimony suggest that between $4,000,000 and $6,300,000 was cut from the company's payroll between 2014 and 2015. *Compare* Def.'s LR 56.1 Stat., Ex. W, dkt. no. 80-1, at 56 (noting that payroll was reduced by "probably" $4,500,000 to $5,000,000 and that ISI "may have gotten" to the $6,000,000 mark), *with id.*, Ex. X, dkt. no. 76-23, at 2-3 (indicating that payroll was reduced by about $6,300,000). The record also suggests that the company had to delay payroll twice during the same two years for lack of funds and that, in July 2015, BMO Harris Bank began the process of terminating ISI's bank accounts. *Id.*, Ex. S, dk.t no. 76-18.

Sweet's arguments about ISI's finances make clear that he believes firing him was a bad financial decision. He argues that ISI's financial challenges were attributable to Burgess's mismanagement rather than his own. But in determining the issue of pretext, the Court does not review the wisdom of business decisions, "even if they are wrong or bad." *Boston v. U.S. Steel. Corp.*, 816 F.3d 455, 466 (7th Cir. 2016). Furthermore, Sweet disputes some of the precise numbers, including the scale of

payroll reduction undertaken by ISI, but he points to no evidence that "the company lied about its financial concerns." *Davis*, 368 F.3d at 784.

Nevertheless, the Court concludes that Sweet *has* pointed to evidence sufficient to support a reasonable inference that ISI's proffered reasons were pretextual based on remarks made by decisionmakers and on the company's shifting justifications for his firing. *See Henderson*, 720 F. App'x at 784; *Zaccagnini*, 338 F.3d at 678.

First, drawing all reasonable inferences in favor of the non-moving party, Burgess' statements that (1) management needed "new blood"; (2) Sweet "had a good run," but it was time for him to go; and (3) "the smart thing for [Sweet] to do [was] retire," support a conclusion that the reason for Sweet's termination was his age. Def.'s Resp. to Pl.'s LR 56.1 Stat., dkt. no 80, ¶¶ 44-45, 70. ISI's argument that these comments were the sort of "stray remarks" that have been deemed insufficient to support an inference of pretext is mistaken. *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007), *overruled on other grounds by Ortiz*, 834 F.3d at 765 (noting that damaging remarks are probative if they were (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action); *see also Adams*, 231 F.3d at 428 (admonishing courts not to carelessly "dismiss as irrelevant damaging remarks" that suggest age-related animus). Because the comments were made by Burgess, a prime decisionmaker, at or near the time of the firing decision and in conversations related to the firing, they were not irrelevant "stray remarks."

Second, as Sweet notes, a reasonable fact finder could conclude that ISI changed its explanation for the firing after its initial representations. It started with

13

Burgess' statements during the firing meeting. Then, it pivoted to emphasizing that poor morale in the consulting division as the motivating factor. Finally, during prosecution of this lawsuit, ISI began to emphasize its purported financial motivation for Sweet's termination, characterizing his firing as part of a broader reduction in force. As in *Zaccagnini*, ISI's repeatedly shifting justifications provide a sufficient basis for a reasonable jury to conclude the company's proffered motivations for terminating Sweet were pretextual.

The Court must view all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Carson*, 865 F.3d at 532. Viewed through that forgiving lens, Sweet has produced evidence that "would permit a reasonable factfinder to conclude that [his age] caused [his] discharge . . . ." *Ortiz*, 834 at 765. The cross-motion for summary judgment on his ADEA discrimination claim therefore fails.

**B.     ADEA retaliation claim**

Sweet next alleges that ISI unlawfully retaliated against him in violation of the ADEA for filing his EEOC age discrimination complaint and this lawsuit. The alleged retaliatory acts centered around a referral relationship that Sweet established after his termination between ISI and RWI Wealth Management, a separate company that Sweet owned.

The ADEA prohibits an employer from retaliating against an employee "because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

14

"To establish a prima facie case of retaliation, plaintiffs must show evidence from which a reasonable jury could find that (1) plaintiffs engaged in statutorily protected activity; (2) they suffered an adverse employment action; and (3) there is a causal connection between plaintiffs' protected activity and [the adverse action]." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000).

The parties focus their arguments on the second element, disputing whether ISI's decision to discontinue post-termination referrals to Sweet's business, RWI, constituted an adverse action. Both cite the definition of an adverse action from the analogous Title VII context: to qualify, "the employer's challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Roney v. Ill. Dep't. of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Adverse actions "are not limited to those that affect the terms and conditions of one's employment," *id.*, and former employees may challenge an alleged act of "retaliation that impinges on their future employment prospects or otherwise has a nexus to employment," *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 (7th Cir. 1996). For instance, opposition to a former employee's application for unemployment benefits may, in some circumstances, amount to actionable adverse employment action. *See, e.g.*, *Benjamin v. Katten Muchin & Zavis*, 10 F. App'x 346, 354 (7th Cir. 2001).

But there are limits. "[A]n adverse employment action does not include an employer's refusal to grant an employee a discretionary benefit to which she is not automatically entitled[.]" *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1033 (7th Cir. 2004). For example, *Hottenroth* held that an employer's refusal to recommend an

employee for a certification—which ultimately resulted in the employee's firing—was within the employer's discretion "and thus did not constitute an adverse employment action." 388 F.3d at 1030. Likewise, an employer's decision to withhold a discretionary bonus payment typically does not amount to adverse action because most bonuses are "wholly discretionary on the part of the employer." *Farrell v. Butler Univ.*, 421 F.3d 609, 614 (7th Cir. 2005) (citation omitted); *see also Maclin v. SBC Ameritech*, 510 F.3d 781, 788 (7th Cir. 2008); *Hunt v. City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000). District courts in this Circuit have applied this logic to employers' decisions to condition other kinds of benefits on terminated employees' release of legal claims against their former employer. For instance, severance payments and extra insurance coverage withheld by employers were deemed discretionary where a former employee refused to sign a release. *See, e.g.*, *Keen v. Teva Sales & Mktg., Inc.*, 303 F. Supp. 3d 690, 720 (N.D. Ill. 2018) (insurance benefits), *appeal filed*, No. 18-1769 (7th Cir. 2018); *Sicher v. Merrill Lynch*, No. 09 C 1825, 2011 WL 892746, *4 (N.D. Ill. Mar. 9, 2011) (severance pay); *see also EEOC v. Sundance Rehab. Corp.*, 466 F.3d 490, 502 (6th Cir. 2006) (holding that failure to award severance pay after an employee refused to sign a waiver of liability was not an adverse employment action). Because they were deemed discretionary, withholding of such post-termination benefits did not constitute adverse action.

Sweet contends that ISI's decision to discontinue its referral relationship with RWI constituted unlawful retaliation against him for making his EEOC complaint and filing this lawsuit. He also argues that ISI intentionally lured the two employees who had transitioned from ISI to RWI, Johnston and Ferrante, away from RWI in further

retaliation. He likens ISI's actions to the interference with unemployment benefits at issue in *Benjamin*, 10 F. App'x at 354, arguing that a sufficient nexus to employment exists to satisfy the Seventh Circuit's standard for post-employment adverse action, *see Veprinsky*, 87 F.3d at 890.

ISI counters that its decision to discontinue its referral relationship with RWI did not constitute an adverse employment action within the meaning of the ADEA because the relationship with entirely discretionary. And, indeed, the parties agree that the Settlement and Referral Agreement Sweet signed during his termination did not create an obligation for either RWI or ISI to refer business to the other. Pl.'s Resp. to Def.'s LR 56.1 Stat, dkt. no. 88, ¶ 14. Rather, it created a standard fee that would be owed when and if such referrals were made. ISI also notes that it continued paying Sweet the $600,000 of severance pay to which he was entitled under the agreement even after it discontinued the voluntary referral relationship. And, on Sweet's contention that ISI lured Johnston and Ferrante away from RWI, the company cites evidence suggesting that Sweet himself *encouraged* Johnston and Ferrante to pursue other employment when he began moving toward litigation against ISI precisely because he anticipated that a lawsuit would disrupt the referral relationship.

The Court is persuaded that the logic of *Hottenroth* and related discretionary-benefit cases applies here. Because ISI and RWI did not oblige themselves to maintain a referral relationship perpetually or even for a set term, ISI had discretion to end the relationship. That is, Sweet was not "automatically entitled" to the relationship's continuance. *Hottenroth*, 388 F.3d at 1033. No reasonable jury could find that the prospect of a cutoff, in the future, of a post-termination business-referral relationship

17

would deter an employee from engaging in protected activity such as filing an EEOC charge. The Court therefore grants summary judgment in favor of ISI on Sweet's retaliation claim.

## Conclusion

For the foregoing reasons, the Court denies Sweet's motion for summary judgment [dkt. no. 66]; grants ISI's cross-motion for summary judgment [dkt. no. 75] on the ADEA retaliation claim (count 2); and denies ISI's motion on the ADEA discrimination claim (count 1). The case is set for a status hearing on November 5, 2018 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

```
                                    _____
                                         MATTHEW F. KENNELLY
                                         United States District Judge
```

Date: October 24, 2018